Good morning. Michael Haddad for the plaintiff, Denise Green. In this nation, all people have a right to be free from the terrifying and humiliating experience of being pulled from their car as a gunpoint, handcuffed, or made to lie face down on the pavement when insufficient reason for such intrusive police conduct exists. You're not suggesting she was laid face down on the ground? No, she was made to kneel. She was made to kneel. Yes, but I'm quoting from Washington v. Lambert. Oh, I'm sorry. I thought you were making an opening statement. An excellent opinion. I'm quoting from Washington v. Lambert because that is the controlling case here, and the facts are very similar. Although she wasn't made to lay face down, she was made to kneel at gunpoint and then handcuffed. And that's why this Court laid down objective standards for courts and for law enforcement to use when assessing the lawfulness of such especially intrusive tactics. Now, Ms. Green was subjected to the full panoply of coercive tactics in the absence of any specific or immediate threat posed by her whatsoever. And the district court in this case failed to give appropriate consideration to the coerciveness of those tactics on an innocent person during an investigatory stop. But would those tactics have been appropriate if there had not been an error in the whatever those initials are for that system that should have shown that the car was a stolen vehicle? No, they wouldn't, Your Honor, because if we apply the four factors that this Court set forth in Washington v. Lambert, which were set forth specifically to give officers the leeway they need to do their job safely, this Court said you can only use those kinds of tactics where, one, the suspect is uncooperative or takes action at the scene that raises a reasonable possibility of danger or flight. She didn't do any of that. Or, two, where the police have information that the suspect is currently armed, well, they admit they had no information about anything that she might be armed. Or, three, where the stop closely follows a violent crime, they had no information other than the possibility of a stolen plate. They didn't know when it was stolen or any crime having happened recently. Or, four, where the police have information that crime that may involve violence is about to occur. And, again, they had nothing specific about any crime that was about to occur. None of those factors applied here. And they admit that their longtime employee, munibus driver Denise Green, did nothing to threaten anybody. She committed no crime in their presence, and they had no specific information about her or her car. And, in fact, she was behaving totally lawfully and cooperatively the whole time. And under this Court's longstanding precedent, most recently reaffirmed in Johnson v. Bart at 724 F. 3rd, 1159, Ms. Green was arrested and not merely detained when she was subjected to such tactics. And, as we all know, arrest requires probable cause. Sergeant Kim admits unequivocally he had no probable cause. At page 141 of the record, in his deposition, he was asked, during this entire incident, did Ms. Green ever do anything unlawful? Answer, not that I can recall, no. Question, and did you ever have probable cause to arrest Ms. Green for any crime whatsoever? Answer, no. Question, did you ever have probable cause to arrest Ms. Green for any offense at all of any kind? Answer, no. Now, for the first time on appeal, the defendants are claiming that the court could find that he had probable cause, but they didn't make that argument in the district court, and, therefore, they've waived that argument. In addition, this Court has instructed that the lack of specificity that leads officers to suspect a person of a crime will further undermine the use of such intrusive and coercive tactics. Let me ask you one other question. Aside from waiving the argument, is an officer's statement that he didn't have probable cause binding, or is that an objective factor? It's an admission, like an admission of any other party. And the defense argues in their brief that it's merely his subjective opinion. But it's an admission, like any other party's admission. And, in fact, this is a highly trained officer who's a sergeant, who's conducted hundreds of high-risk traffic stops like this one, and he's been trained, and he understands that probable cause is an objective standard. So when he says, I had no probable cause to arrest her for any crime whatsoever, he understood what probable cause was. Right. But he's expressing his subjective belief. Right. I mean, we have to look at probable cause from an objective point of view. Certainly, we can take that into consideration, that the officer himself may have. But I don't think it's conclusive, do you? I don't think it's a subjective belief, Your Honor, because in that sense, anything anyone says could be deemed a subjective belief. He made an admission based on his training and experience and knowing what the standard was. But, as I pointed out, the defense never raised this in the district court. This is a new lawyer's argument that we're hearing for the first time on appeal. And in any event, there was no probable cause. Let me ask you what Officer Kim can reasonably rely upon. The ALPR goes off. The officer who actually sees the ALPR has the responsibility, I think, to double-check to see if, in fact, the numbers are right. And, of course, this was not done in this particular case. Does the second officer down the line have a right or an opportunity, I guess, to say, I can rely upon what this officer has said about the existence of a stolen license plate because I know that that officer was, in fact, supposed to double-check? In which case, then, are there any policies in the San Francisco Police Department which suggest that the initial person has that responsibility and that the second person can rely upon that first person's observation? Yes. I'm glad you asked me that because there are no policies. Oh, that's good. That's good. That's a good start. You could also say that's a good question. That's true. I don't want to presume to say that, but there are no such policies, Your Honor. This is argued by the district court. Is that the basis of your Monell claim, that there are, in fact, no policies which actually direct San Francisco officers about who to rely upon and what are the circumstances upon which that reliance is justified? That will be the basis of our Monell claim when we're remanded, if that goes to the district court again. But that was not at issue in the summary judgment motion. It was not briefed substantively. The only argument about the Monell claim was that it should be dismissed at that early stage because the underlying claims against the officers fail. So we never had an opportunity to put that in front of the court. So what's your Monell theory, though? I'm sorry? What's your Monell theory? Well, it's not before this Court, but our Monell theory would be that there is no training and the failure to train theory as opposed to. And also no written policies at the time. There's one after the fact, but there was no written policies at the time. So you're not claiming custom and practice? Yes. What's a custom and practice? Well, we're claiming that there is a failure to have appropriate training and policies in the face of an obvious need. And that's well established in Ninth Circuit case law, that where there is an obvious need that in the absence you can violate constitutional rights, you need to provide such training and policies. Right. I mean, there's a difference between a failure to train Monell claim and a custom and practice of unconstitutional behavior claim. Correct. So I gather you're doing a failure to train. We have both, Your Honor. So what's the unconstitutional practice? Yes. No, what is the unconstitutional practice or custom or policy? You say there's no policy. That in and of itself is not unconstitutional. You can operate without a policy. It is unconstitutional to fail to have a policy in the face of an obvious need for a policy. And I believe there's, again, this isn't a part of this appeal, but I believe there's a case called Oviatt, which talks about the absence of a policy in appropriate circumstances can form a Monell claim. But I just want to point out that the Monell claim was not substantively raised in the motion below it. And we understand. Okay. I'm getting a little nervous. Third time. Okay. I'm sorry. Let me go on, if it's okay. I think it's very important for this Court to see why I'm saying that there was no policy or procedure saying that that ALPR operator was the only one responsible to check the license plate that it matched. Now, the defendants talk about this policy, and I'm surprised they even say it's undisputed in their brief at page 4. And they cite three places in the record. They cite to ER-324, which is their expert's report, who's a retired police officer from a different jurisdiction who's not even talking about San Francisco policy. And then they cite to page 215, which is their newer policy, which was written after this incident, which says nothing about their claim that only the ALP operator is required to check the match of the plate. And finally, they cite page 163 of the record, which is the person most knowledgeable deposition of Officer Dealey, who says just the opposite. So there is nothing in the record to say that only Officer Esparza, who was running the camera car, had the obligation to match this plate. And, in fact, Esparza broadcast. When he was asked what color is the car, he says, I'm not sure. It was clear he couldn't get a good look at the car itself, let alone the license plate. Well, did your 30b-6 witness that you deposed after your initial hearing but before the ruling, as I understand it?  Did that witness, in fact, say it was unreasonable for the second officer not to make an independent assessment as to what the plate was? I didn't ask him that question about assessing liability or blame, but I did ask him this. If the officer in the ALPR car is not in a position to visually confirm the license plate itself, then some other officer should make that visual confirmation before executing a felony stop. Correct? Answer, yes. But then one of the problems in your case is you dropped the case against Officer Garcia. Is that right? Officer Esparza, yeah. I'm sorry, Esparza. And theoretically, your argument could have been that Officer Esparza should have said that he didn't confirm the license plate, so thereby notifying all subsequent officers involved in the investigation that they had to make the determination as to whether there was verification or not. But you dropped the case against him. Yeah. Why did you do that? You know, I took his deposition, and it was clear to me that he was not the cause of this. The experienced sergeant failed repeatedly to simply look at the license plate. When he testified, it's vital that I read the entire plate and radio it in to the dispatcher before. I thought, personally, I thought, I'm being a nice guy. I'm going to let this officer out because he wasn't really the cause of all this. And then, I'll probably never do that again because right after that, the city's position changed, and they started pointing the finger at the guy that I let out. What's that about nice guys always finish last? But I'm still comfortable with the decision that Sergeant Kim was ultimately at fault here because he's the leader of all this. They admit he's an integral participant in the whole thing. He's also the leader. He's got supervisory liability as well. And he says in his deposition that before executing a high-risk stop, it's important to read the whole plate. He had the opportunity many times. And before subjecting someone to these coercive tactics and gun points, who could be totally innocent, he doesn't even bother to check the whole plate. And he had plenty of opportunities. And if you listen to the radio or even read the transcript of it, you can see that when he did call in the plate, you can hear in the background someone still saying, get your hands up. So the high-risk stop was still happening. Code 4, meaning everything is okay now, everything's safe, wasn't radioed in for two more minutes. So he does call in the plate in the heat of this high-risk stop. And that really undermines his claim in his deposition that I couldn't look at the plate because I was getting ready to do a high-risk stop when he did look at it in the middle of the high-risk stop. He has no excuse for not looking at it. But I think the most important point of our case here is that the coercive tactics and the absence of any specific information that she posed a threat or was involved in violent crime or about to commit a violent crime, that means this was an arrest. And there was no probable cause for this. All they had was this tip from a notoriously malfunctioning device that even Sergeant Kim testified he understood that that thing can make mistakes and it's important to confirm it. At Sergeant Kim's deposition, this is record page 126, he was asked, so would you agree that your general understanding as of the time period of the Greene incident was that you should generally get confirmation that a car is stolen before subjecting the people to a high-risk stop? Answer, yes, sir. And then we go on. And if the tip came from an ALPR camera, you get confirmation before doing the stop, right? Answer, if you can, yes, sir. All right. You're way over time and I didn't notice. I didn't notice either. I'm sorry. I'll stop here. Thank you. Thank you. We'll still give you two minutes for rebuttal. Thank you. And we'll give your opponent a little bit of extra time if she would like it. Thank you. Good morning. May it please the court, my name is Christine Van Aken for defendants. Sergeant Kim reasonably believed that he had confirmation of the license number and that he had confirmation that that license plate was stolen. Here's what he heard, and this is all apparent from the transcript of the CAD, which begins at page 335 of the excerpt of record. He hears there's a license plate 5SOW750 and I've got a hit. He hears that it is a four-door car, probably a Lexus, a dark color, I think it's burgundy. He hears a statement from Officer Esparza that he would detain the car if he could. He hears this is just information for Ingleside if anybody wants to go get it, and I would go get it, but I have a custody. No doubt there that the proper course of action is to go get that car. He also hears Officer Esparza asking dispatch to confirm, but this is not a request for confirmation that the visual reading of the plate matched the actual plate. Dispatch has no information about that at all. Only Officer Esparza has that information because he's the one with the computer screen that shows the digits that the computer read compared to a picture that the computer took. So when he says dispatch, confirm it, he can't be saying dispatch, please confirm that my computer car saw what it thinks it saw. But Officer Kim actually was following the car, the car stopped at a light. Right. Officer Kim comes behind the light. It just sits behind this car. Right. He could very easily have read off the numbers to dispatch to check whether, in fact, this is the car, this is the correct number, and didn't do that. Just didn't do that. And why is that not significant? Judge Sessions, I have two answers to that. The first is that under the law, as described by the Supreme Court and this circuit, Officer Kim is not required to double-check information he has already received. He's not required to rerun plates, for instance. Motley v. Parks makes that clear. United States v. Hill, the officers made an arrest. The man said, wait, here's my ID. You've got the wrong person. The Supreme Court said, you know what, sometimes people give the wrong ID. Red flags don't vitiate his reliance. In fact, what Motley says about that, Motley says, yes, when you get convincing evidence that the evidence you've received from other officers, the information you've received from other officers is wrong, you have a duty to double-check. But in the absence of convincing evidence that he has heard something wrong, that he doesn't have a duty to double-check. And let me address the factual point, my second response to Judge Sessions' question, which is that it's not true that he had ample opportunity. Here's what he testifies. He says that he heard the digits, but he really only had in his mind 5SOW, which is the match. He says that he confirmed that the plate in front of him said 5SOW, but he could only get a partial visualization while he was following it. And then he says, and let me give you the citations, because this is important. He says, you know, he didn't have S750, the discrepancy part of the plate, in his mind. That's at Excerpt of Record 139. And he says that he only remembered the first few digits when he heard it. He only had 5SOW in his mind. That's at ER 129. And so he, as far as he's concerned, there's no red flag. He has 5SOW in his mind, and that's what he sees on this plate. As for the proposition that he should nonetheless, that he stops her, he could have been in the car and run the plate at that point, what he testifies to at Excerpt of Record 130 and 131, he says that while he is following her, he is figuring out where to make the stop,  so he's not available to do, it's not that he's twiddling his thumbs while all this is happening. And then once he stops her, he finds this safe place and stops her, he doesn't, his instruction, his training, is that this is a very dangerous time for a police officer. When you've stopped somebody who you think is a felon in possession of a stolen car, and you're giving them an opportunity to take action against you, to draw a gun, to destroy evidence, his training is you make that stop, you execute that stop, and you get that suspect under control as soon as possible. And he uses his trainings in conflict with the Washington factors. Judge Thomas, the Washington factors, I don't think so. No, I don't think there's any conflict. Why don't you first distinguish Washington. Yes. And then if you don't mind, assuming that Washington applies to the situation, go down the factors and tell me how they're satisfied. Okay. So first let me distinguish Washington, Judge Thomas. Washington, first of all, applies to an investigatory detention and tells us when officers use tactics that are so intrusive that a stop supported only by reasonable suspicion must be supported by probable cause. There was probable cause here under Rody v. City of Roseburg. There is probable cause to arrest a driver of a car that has been reported as stolen. But assuming there was no probable cause and only reasonable suspicion. Washington v. Lambert does identify four factors for determining whether someone is violent and likely to resist. But it prefaces those four factors with the phrase such as. So clearly they are not meant to be. But it gives examples. And I gather without going through all of them that probably they weren't satisfied. Those factors, there's no specific information that this suspect has a weapon. There is extremely specific information under the facts, as Sergeant Kim reasonably believed them to be true, that this suspect is driving a stolen car, is a felon, and that's a category of crime that is extremely dangerous. So while there is no specific information about a gun in Ms. Green's possession, a stolen car and stopping a felon with a stolen car is very dangerous for police. Pennsylvania v. Mims recognizes that. Peace officer training standards in California list stolen car as one of the examples for high-risk felony stops. So if it is in fact a misapprehension, it's a misapprehension shared by law enforcement throughout California that this is the kind of stop where you make a high-risk felony stop. But the Court doesn't need to reach that issue or distinguish Washington v. Lambert because there was probable cause here on the facts that Sergeant Kim believed. And I want to address briefly this issue of admissions because it is simply not true that Sergeant Kim admitted his conduct, you know, that he did not have probable cause to arrest under these facts. He was being asked about hypotheticals. Did you, you know, did Ms. Green, in the 2020 hindsight that you have now, did Ms. Green commit a crime? No. And furthermore, Sergeant Kim isn't authorized to make admissions on behalf of San Francisco. And San Francisco, in fact, argued at the hearing on summary judgment that there was probable cause. That's at page 24 of the excerpts of record. So because there was probable cause here or because a felony stop of a stolen, of a driver driving a stolen car is justified by officer safety concerns, the officers here executed the stop. Can I just change your focus for a second to the excessive force claim? Yes. And I appreciate that there may be disputed facts about exactly what happened. But if you take those facts in the light most favorable to the nonmoving party in this particular case, it appears that this is a 47-year-old woman, obviously heavyset, having difficulty with knees. She's forced to her knees at gunpoint. She's unhandcuffed. And then there continues to be guns focused in upon her, including shotguns, until all of a sudden they determine that, in fact, she's perfectly innocent. So then you have your 30B witness basically say that ordinarily the general policy is that you don't point guns at individuals unless you are in a situation in which you would use it and that you always put the guns down because necessarily they could go off or, in fact, they are so threatening in nature as to create a real distressful situation. So I appreciate the fact that there may be disputed facts, but under those facts, if accepted by a jury, could you really say that there's no reasonable juror out there who could actually determine that to be excessive force? Another really good question, Judge Sessions. You did very well today. Yes. So I want to – I actually am glad to have the chance to clarify this because plaintiff's briefs make it sound like her testimony is that she was handcuffed and guns were trained on her the entire time. That is not her testimony. Her testimony was, I was stopped. There were guns pointed at me, at least four, maybe more, including a shotgun. All of that is true. Then she goes to her knees. She is handcuffed. Officer Kim, Sergeant Kim then helps her up off of her knees. She looks up. She sees guns pointed at her still. She looks down, and she doesn't look again. So there's no testimony. There are no facts plaintiff has to indicate that the duration of her handcuffing, which she alleges is 10 minutes, but the CAD would seem to indicate was far shorter than that, there's no testimony that guns were trained on her while she is handcuffed for any duration of time. But you just said that when she was lifted, she looked around and she saw guns pointed at her, and there's no evidence to suggest necessarily that the guns were no longer pointed at her from that point forward until ultimately her handcuffs were taken off. Well, there is, Your Honor, because the officers testified that they did not point their guns at her after she was handcuffed. And she has no contrary testimony. But my point is that this is all sort of one process. She is cuffed. Officer Kim helps her up. She sees the guns. She doesn't look again. That is the end of the handcuffing process. So they have their guns on her to make sure that she is secured. And at the same time, there's testimony that the search of the car is ongoing. So they're still figuring out whether there are other suspects. So, you know, it would make sense that the guns would still be out. But there's no testimony that after that process of handcuffing her is complete that the guns remain pointed at her. So I think on those facts, there's no ‑‑ which is her testimony, no reasonable jury can find that this is a case where the officers continued to terrorize her with guns after she was secured. And immediately after this incident, I mean, Mr. Haddad pointed out that Sergeant Kim, once there are other officers present who are securing the scene, he is immediately radioing this in to investigate. He is immediately calling dispatch. The discrepancy is cleared up. So even under Ms. Green's testimony, she is handcuffed for no more than 10 minutes, and she is left to go on her way. This is not a case like Gilles v. Rapicci, the one that Judge ‑‑ I found it interesting that you actually cited one of my cases. I'm from Vermont. Well, a reasonable ‑‑ it's very similar facts. And a reasonable officer looking at those facts is going to think, I at least have a suspect to go on her way, and that is exactly what happened here. You must have not read to the end of that case, because I said that there was a proper detention at the beginning, but then it evolved in such a way as to result in reversal and remand. Yes, exactly. I did. And this did not happen like that. They let her go. They let her go as soon as they cleared up the error. She was not harmed. Unless the panel has further questions, I'll submit. Thank you, counsel. I would just like to point out how officers are trained by California Post. This is at pages 236 and 237 of the record. This is about high‑risk pullovers. And they're trained that they should only do a high‑risk pullover generally where the officer has reason to believe that one or more occupants of the car may be armed, represent a serious threat to the ‑‑ to officer's safety, or have committed a felony. And they give examples such as occupants ‑‑ But why don't they have cause to believe that the occupant of the car committed a felony in being in possession of a stolen vehicle? Because the information is very sketchy. As this Court pointed out in Washington, the lack of specificity in the pullover or the belief that the person may have been involved in a crime can also undermine the officer's perception of a threat. And it was very unspecified here. No one ever said, I verified the plate. And even when Officer Kim says all I could look at was the first four letters, that was only at the beginning. That was at his first glance. Assuming hypothetically that there was probable cause to believe that the car was stolen, would you agree that a high‑risk stop was appropriate? I think that under Washington, you still need evidence of one of those four factors, which is not necessarily there every time, because even in Washington, they pulled those guys over because they thought they were involved in a string of armed holdups, the most recent one being only six days earlier. In Washington, this Court said that's not even a close case. These guys didn't do anything in particular. Just like Ms. Green. In Washington, the Court said it's important to give officers the room and the leeway they need for their safety. And this Court also said it's really important that we respect the rights and the dignity of all persons coming in contact with police officers. And as this Court also quoted in Washington in the very first lines of it, the security of one's privacy against arbitrary intrusion by the police, which is at the core of the Fourth Amendment, is basic to a free society. And that's why we're here. Thank you. Thank you both. That was a very good argument on both sides. And Judge Sessions asked wonderful questions. Case 10-4 will be submitted.
judges: Sessions, Reinhardt, Thomas